# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00469-CV

---

**E. G., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 320,567-B,**
**THE HONORABLE CARI L. STARRITT-BURNETT, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

Following a bench trial, the district court terminated the parental rights of E.G. (Father) to his child A.G. (Daughter), born August 23, 2019.[1]  In three issues on appeal, Father asserts that (1) the district court abused its discretion by beginning the trial in Father's absence and that the evidence is legally and factually insufficient to support the district court's findings that (2) the statutory grounds for terminating Father's parental rights were satisfied and that (3) termination of Father's parental rights was in Daughter's best interest.  We will affirm the district court's termination decree.

---

[1] For the child's privacy, we refer to her by her initials and her relationship to her parent, and we refer to her family members by their initials and by their relationships to the child.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

# BACKGROUND

The case began in October 2020, when the Texas Department of Family and Protective Services (the Department) received a referral alleging neglectful supervision of Daughter by her mother, A.B. (Mother). In the Department's removal affidavit, Department investigator Courtney Nabors averred that Daughter had tested positive for methamphetamines after Mother took Daughter to the emergency room "for an altered state" in which Daughter "was awake and staring into blank space but was not active." Mother initially denied any past or present drug use but eventually admitted that she had a two-to-three-year history of using methamphetamines and living with friends who used methamphetamines, including while Daughter was in her care. Following further investigation, which revealed that Mother had two other children removed from her care due to substance abuse, the Department sought and obtained emergency removal of Daughter from Mother.

Father was incarcerated in Bell County Jail at the time of Daughter's removal, awaiting trial on multiple criminal charges.[2] During the Department's investigation, Nabors interviewed Father at the jail. According to Nabors's notes from the investigation, a copy of which was admitted into evidence,

> [Father] stated [Mother] has always had a problem with using methamphetamines, especially with the individuals she surrounds herself with. [Father] admitted just recently [Mother] has begun drinking heavily along with her substance abuse and he has continued to ask [Mother] to leave the area [where she lives] for [Daughter] and her safety. [Father] stated he has been in [Daughter's] life since she was born until he became incarcerated. [Father] further explained he has

---

[2] The Department's removal affidavit reflects that Father was being held on several charges at the time the case began, including tampering with physical evidence, evading arrest with a previous conviction, failure to identify as a fugitive, driving with an invalid license, and evading arrest or detention with a vehicle.

always worked to provide for [Daughter] and as long as he was present [Mother] was doing well, because he paid all of the bills. . . . [Father] stated he and [Mother] were together a little over two years after [Mother] got pregnant, because he decided to stay. [Father] stated he is willing to do whatever the Department needs when he is released to get [Daughter] back.

The case proceeded to a two-day bench trial on April 11 and May 18, 2022. Approximately one week before trial began, Father's counsel applied for a bench warrant to secure Father's presence at trial, and the district court ordered that a bench warrant be issued, finding "that there is a necessity for the presence of" Father at trial and that "the ends of justice require his presence." However, Father was not brought to trial on April 11 as ordered.[3] At the beginning of trial, Father's counsel announced "not ready" and requested a continuance so that Father "may attend this trial." The Department initially opposed the continuance, noting that the dismissal date for the case was April 23, but later stated that if Father's counsel "would like a continuance to get her client here, we're unopposed if we are able to start and call Ms. [Cathy] Rothas," the guardian ad litem for the child. The Department explained that Rothas "will not be able to be a witness at a later date" because "she won't be with the Department" later and "she's going to be undergoing a medical procedure and will be medically unable to testify in the future starting Wednesday," April 13. The district court told counsel that it agreed that Father "has a constitutional right to be present on something as important as this" but faulted counsel for not requesting a bench warrant "earlier than she did." After asking counsel that she request a bench warrant "at least a month in advance" next time, the district court ruled:

_____

[3] The record contains limited information as to why Father was not brought to trial. According to a "Warrant Service Report," which was signed by the sheriff's office on April 8, 2022, the warrant was "returned unserved" because "Subject [was] in TDCJ, did not receive in time to pick him up. Need 24 hrs advanced notice." April 8 was a Friday and April 11, the date trial began, was a Monday. However, the record reflects that the district court signed the order for the bench warrant on April 4, and the bench warrant was issued on April 6.

> I'm granting your motion for continuance under these circumstances, because we do have a dismissal date probable and we have witnesses that are here that have limited schedule. And we have attorneys from out of town that are here so we're going to start the trial. And we are going to begin it and allow at least Ms. Rothas to testify. That's the best I can offer you. And that's the best I'm going to do. That's my Ruling. So we're going to proceed at this point in time.

Rothas was the only witness to testify on April 11.

On May 18, 2022, the trial continued. This time, Father's counsel filed her application for a bench warrant on April 20, the district court issued a bench warrant for Father's appearance on April 21, and Father appeared at trial and testified. Other witnesses at trial on May 18 were the Department caseworker, Marlena Roberts; Father's two brothers and sister-in-law, who expressed their willingness to serve as placements for Daughter; and Daughter's foster mother, A.S. (Foster Mother).

At the conclusion of trial, the district court found by clear and convincing evidence that Mother had: (1) knowingly placed and knowingly allowed Daughter to remain in conditions and surroundings which endangered her physical and emotional well-being; (2) engaged in conduct and knowingly placed Daughter with persons who engaged in conduct which endangered her physical and emotional well-being; (3) constructively abandoned the child; and (4) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O). Regarding Father, the district court found by clear and convincing evidence that he had: (1) knowingly placed or knowingly allowed Daughter to remain in conditions and surroundings which endangered her physical and emotional well-being; and (2) engaged in conduct or knowingly placed Daughter with persons who engaged in conduct which endangered her physical and emotional well-being. *See id*. § 161.001(b)(1)(D), (E). The

4

district court also found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the best interest of Daughter. *See id.* § 161.001(b)(2). The district court later signed a termination decree terminating Mother's and Father's parental rights to Daughter and appointing the foster parents as possessory conservators of Daughter.[4] This appeal by Father followed.[5]

## ANALYSIS

**Bench Warrant**

In Father's first issue, he argues that the district court abused its discretion by beginning the trial in Father's absence. According to Father, starting the trial without him violated his constitutional right to due process.

All litigants who are forced to settle disputes through the judicial process have a fundamental right under the federal constitution to be heard at a meaningful time and in a meaningful manner. *Larson v. Giesenschlag*, 368 S.W.3d 792, 796–97 (Tex. App.—Austin 2012, no pet.) (citing *Dodd v. Dodd*, 17 S.W.3d 714, 717 (Tex. App.—Houston [1st Dist.] 2000, no pet.), *disapproved of on other grounds*, *In re Z.L.T.*, 124 S.W.3d 163, 166 (Tex. 2003)). Litigants may not be denied reasonable access to the courts simply because they are inmates. *Id.* at 797 (citing *In re Z.L.T.*, 124 S.W.3d at 166; *Boulden v. Boulden*, 133 S.W.3d 884, 886 (Tex. App.—Dallas 2004, no pet.)). However, this does not mean that an inmate has an absolute right to personally appear in every proceeding. *Id.* "The right of a prisoner to have access to the court entails not so much his personal presence as the opportunity to present evidence or contradict the

---

[4] The foster parents intervened in the proceedings below and have also filed a brief on appeal responding to Father's arguments.

[5] Mother has not appealed the termination decree.

5

evidence of the opposing party." *Dodd*, 17 S.W.3d at 717. Therefore, "if a pro se inmate is not allowed to participate in a proceeding in person, a trial court should nevertheless afford the inmate an opportunity to proceed by affidavit, deposition, telephone, or other effective means." *Larson*, 368 S.W.3d at 797 (citing *In re R.C.R.*, 230 S.W.3d 423, 427 (Tex. App.—Fort Worth 2007, no pet.); *Sweed v. City of El Paso*, 139 S.W.3d 450, 452 (Tex. App.—El Paso 2004, no pet.); *Boulden*, 133 S.W.3d at 886)); *see also In re M.A.R.*, No. 03-10-00444-CV, 2012 WL 593569, *4 (Tex. App.—Austin Feb. 23, 2012, pet. denied) (mem. op.). We review a trial court's decision on an inmate's request to participate, either personally or by alternative means, for an abuse of discretion. *Id*. at 796.

Here, in granting Father's request for a bench warrant, the district court expressly found "that there is a necessity for the presence of" Father at trial and that "the ends of justice require his presence." Nevertheless, the district court allowed Cathy Rothas, Daughter's guardian ad litem, to testify at trial in Father's absence.

The Department argues that this was not an abuse of discretion because on April 11, 2022, the date that Rothas testified, the statutory dismissal deadline was approaching. *See* Tex. Fam. Code § 263.401(a) (providing for automatic dismissal of case unless "the court has commenced the trial on the merits or granted an extension" prior to dismissal deadline).[6] However, to comply with the statutory dismissal deadline, the district court simply had to "commence" trial before the dismissal deadline. *See id*.; *see also In re Z.S.*, 631 S.W.3d 313, 318 (Tex. App.—Houston [14th Dist.] 2020, no pet.) ("To 'commence' means to 'start.'"). Thus, it could have begun trial on April 11 and continued it to a later date without calling Rothas.

---

[6] The original dismissal deadline was October 25, 2021. However, on October 6, 2021, the court extended the deadline to April 23, 2022.

The Department further argues that the district court did not abuse its discretion because Rothas would be unavailable to testify beginning on Wednesday, April 13, due to an unspecified medical procedure, and as the guardian ad litem, Rothas had a right to testify at trial regarding her recommendations. *See id*. § 107.002(e) ("[T]he court shall ensure in a hearing or in a trial on the merits that a guardian ad litem has an opportunity to testify regarding . . . the guardian ad litem's recommendations relating to: (1) the best interests of the child; and (2) the bases for the guardian ad litem's recommendations."). However, it appears from the record that Rothas was available to testify after her medical procedure. After Rothas testified, the Department asked the court to "officially excuse" her from further testimony "because she will be unable to come back likely at the next hearing." Rothas then asked the court, "When is the next hearing?" The court responded, "We don't know yet. Hopefully we're going to find that out here soon." After further discussion of the matter, Rothas informed the court, "I'll be here until next September. So as long as the hearing happens before then." In fact, the trial continued and concluded on May 18, well before September. Thus, the district court could have waited until Father was present at trial to have the guardian ad litem testify, but it did not. On this record, because the district court found that Father's presence at trial was necessary but nevertheless allowed a witness to testify at trial in Father's absence, we conclude that the district court abused its discretion.[7] *See In re L.N.C.*, 573 S.W.3d 309, 322–23 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

---

[7] The Department also argues that the district court did not abuse its discretion in denying Father's oral motion for continuance because the motion was not supported by affidavit. *See* Tex. R. Civ. P. 251 (providing that continuance shall not be granted "except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law"); *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986) ("Generally, when movants fail to comply with Tex. R. Civ. P. 251's requirement that the motion for continuance be 'supported by affidavit,' we

However, that does not end our inquiry. In civil cases,

> No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals.

Tex. R. App. P. 44.1(a). We cannot conclude that either condition was satisfied here. Even though Father was not present during Rothas's testimony, his counsel was present, and the record reflects that she engaged in an extensive and effective cross-examination of the guardian ad litem, pointing out inconsistencies in her testimony and a lack of thoroughness in her review of the potential placements for Daughter. Additionally, Father testified extensively at trial, called witnesses on his behalf, and observed in person the testimony of all the witnesses except for Rothas. Although he was not present for her testimony, he was present for the testimony of Department caseworker Roberts, and the record reflects, as we will discuss below in our sufficiency analysis, that Roberts testified to essentially the same or similar facts to which Rothas had testified. In sum, even though the district court should not have allowed Rothas to testify in Father's absence, we cannot conclude on this record that Father was harmed by the error.

We overrule Father's first issue.

---

presume that the trial court did not abuse its discretion in denying the motion."). In this case, however, the issue is not whether the district court abused its discretion in denying Father's motion for continuance, because it granted the motion at least in part, but whether it abused its discretion in allowing a witness to testify in Father's absence before the trial was continued.

**Evidentiary Sufficiency**

We next address Father's second and third issues, in which he challenges the sufficiency of the evidence supporting the district court's findings. In his second issue, Father asserts that there is insufficient evidence that he knowingly endangered Daughter. In his third issue, Father asserts that there is insufficient evidence that termination of his parental rights was in the best interest of Daughter.

*Standard of review*

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the child's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently,

termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

However, "an appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they

are not absolute." *Id*. "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id*.

### *Evidence presented at trial*

Father testified that he and Mother began living together in 2018 and explained that when they started living together, he was aware that Mother had two children, but he did not become aware until "later on" that Mother had lost custody of them because of her substance abuse. Father acknowledged that he was aware that Mother had a drug problem, although he testified that he was not aware that Mother used illegal drugs at the time he was arrested. However, on cross-examination, the attorney ad litem for Daughter elicited the following testimony from Father:

Q.      All right, sir. Before [Daughter] was born, did you have any knowledge that the mother was using illegal drugs?

A.      Before she was born?

Q.      Yes, sir.

A.      Yes.

Q.      I'm sorry. I couldn't understand you?

A.      Yes.

Q.      All right. What was she using?

A.    Meth.  Crystal meth.

Q.    All right.  After [Daughter] was born, did you – was she continuing to use the meth?

A.    Yes.

Q.    Well, if you allowed [Daughter] to stay in her care, do you agree that that constituted conduct that endangered the physical or emotional well-being of the child?

A.    I think that's a fair question, yes.

Q.    You agree with that?

A.    I agree with that, sir.

Q.    Your criminal activity that resulted in your arrest and incarceration, since that took you away from being able to see [Daughter] or care for her or support her, do you agree that that was conduct that endangered [Daughter]'s physical or emotional health and well-being?

A.    Yes.

Father also testified that he had "confronted" Mother "a few times" about her drug use and her association with drug users because he did not want drugs around Daughter.

The last time that Father saw Daughter was in 2020 at a motel where he, Mother, and Daughter were living at the time.[8]  One day when Father was alone with Daughter, the police arrived at the motel to arrest Father for the offenses of evading arrest, failure to identify,

_____

    [8] Father initially testified that the last time he saw Daughter was in 2019, but he later testified that the last time he saw her was when he was arrested for evading arrest, which the record reflects was in 2020.

12

driving with an invalid license, and criminal mischief. Father called Mother, who was "at the store" at the time, and she returned to the motel to care for Daughter once Father was arrested.

Father admitted that he had been arrested "[q]uite a few times" throughout his adult life, for offenses committed in Louisiana, North Carolina, and Texas, although he could not provide an exact number of arrests. The Department questioned Father extensively about his criminal history, which included arrests and convictions for drug possession, theft, credit-card abuse, and providing fictitious identifying information.[9] Father acknowledged many of his arrests and convictions but denied or claimed not to remember others. On advice of counsel, Father also pleaded the Fifth Amendment to some of the Department's questions related to his criminal history. Father acknowledged that he had an older child, a 26-year-old daughter, and that he had been involved in criminal activity for the majority of her life. Father had been incarcerated in North Carolina from 2000 to 2006 and in Louisiana for approximately eleven to fifteen months around 2015. He had several arrests and convictions in Texas beginning in 2016.

In June 2021, Father pleaded guilty to charges of tampering with physical evidence and evading arrest, arising out of offenses committed in 2018, and another charge of evading arrest, committed in 2020. Father received an eight-year sentence for two of the offenses and a twelve-month sentence for the third offense, with the sentences to run concurrently. The Department questioned Father about the evading-arrest charges, asking him if he felt that it was "selfish" to evade the police "knowing your child needed you to support her when you just didn't want to be arrested on an old warrant." Father responded, "Selfish on my part? I must agree with that. That's a fair question."

---

[9] Father had an alias that he used to avoid apprehension by authorities.

13

Father testified that his plans for Daughter were for his brother, F.M. (Uncle 1), and his brother's wife, C.M. (Aunt), to raise Daughter while he was in prison and then for him to raise Daughter upon his release, either in 2028 when he finished serving his current sentence or earlier if he were to be released on parole.[10] Father believed that he exhibited "great parenting abilities" before his incarceration, including "spending quality time" with Daughter, "just watching her grow up, watching her be a child," "[l]oving her, caring, nurturing her," and "[m]ak[ing] sure she had the proper things in life. Food, shelter those type of things."

Father added that even if his rights were terminated, he would want to maintain contact with Daughter and would "want her with family." He believed his family would be able to provide Daughter with a support system and awareness of her family history and African-American culture and heritage. Father further testified that he loved Daughter, had a "great" relationship with her, and sent cards and letters to her from prison. However, when asked if he currently had a relationship with Daughter, Father testified, "At this time, not really," and he acknowledged that at this time, Daughter might consider him to be a stranger.

Uncle 1 testified that he had never met Daughter but wanted her to be placed with him and his wife because "being connected to family is also important to [Daughter's] development," and he wanted to provide Daughter with a familial relationship that Father had not received as a child. Uncle 1 acknowledged that Father could not protect Daughter while incarcerated but "maybe" could protect her after he was released from prison, "if he stayed on the program and worked toward recovery and stayed out of trouble." Aunt shared Uncle 1's

---

[10] At the time of his convictions, Father had approximately one year of credit for time served. Father testified that he was currently "under review" for parole and that he would be eligible for parole beginning in September 2022, although he acknowledged that he did not know if he would "make it."

14

desire that Daughter be raised by biological family, and she testified that her plan for Daughter was "to love her, nurture her," "teach her of her heritage," "help develop her in her identity and knowing who she is and where she comes from," to love Daughter as she loves her own children, and to introduce Daughter to her extended family. Father's other brother (Uncle 2) testified that he believed "it is not the State's responsibility, it's the family's responsibility to care for the child" and that he also was willing to care for Daughter while Father was in prison. Uncle 2 believed that termination of Father's parental rights was in Daughter's best interest only if Daughter were to be adopted by a biological family member.

Daughter had been in her current placement since October 2020. Foster Mother testified that she is a real-estate agent and runs a successful cookie business. Her husband is a high school math teacher and coach. Foster Mother described Daughter as "adorable," "happy and funny and smart," and "a joy, an absolute joy, to be around every second." According to Foster Mother, Daughter referred to her and her husband as "Mommy and Daddy," and Daughter was "very much" bonded with Foster Mother and everyone else in their household. Foster Mother and her husband had five other children, with their ages ranging from 12 to 21. The couple also had previous experience as foster parents to nine children, although most of those were temporary placements. Foster Mother explained,

> [W]hen a placement comes into our home, our ultimate goal is to help facilitate and encourage reunification, if possible. . . . When you see the need that we've seen and that we've experienced, you can't unsee it. And so we just feel the calling to be a part of caring for children, really as hope that their biological mom and dad will do what they need to do to get their child back. That's our primary goal.

However, Foster Mother wanted to adopt Daughter. She testified:

My hope is that she will stay with our family. My hope is that we can continue to love and provide the security and a home for her. My hope is that we would be the ones to help her navigate life, and to find out what she's good at and help her pursue her interests and dreams. And for us to continue to have her a part of our family.

Foster Mother added that she and her husband were "absolutely" committed to continuing to provide Daughter with a safe, stable, and loving home for as long as she needs one.

Department caseworker Marlena Roberts, who had supervised the case since it began, testified that the Department had performed home studies on multiple placements for Daughter, including the foster parents, the maternal grandmother, father's friend Sherri Murphy, and Uncle 1 and Aunt. The maternal grandmother "bowed out" of the process because she "didn't want to disrupt" Daughter's current placement with Daughter's foster parents. Murphy, who was 67 years old, told the Department that she was "too old" to adopt Daughter but wanted to provide Daughter with a home until Father was released from prison. The Department was not in favor of this placement because Murphy had never met Daughter and was not "planning to be a long-term placement" for her, and the Department "didn't want to disrupt a long-term placement for a placement that wouldn't be long term." The Department was not in favor of placing Daughter with Uncle 1 and Aunt because even though Daughter was related to them, she had lived with her foster parents for approximately one year and had "absolutely" bonded with them. Roberts explained, "So she's been there so long, that that is her family. So it would be very detrimental to her well-being to disrupt her from what she pretty much only knows."

Roberts did not believe that it was in Daughter's best interest to have any further relationship with Father. She also did not believe that Father and Daughter would ever be able to have an appropriate father-daughter relationship, "[w]ithout much rehabilitation" on Father's

16

part. She explained that "based on his criminal history," there was "definitely a concern" that Daughter could be at risk of harm if she continued to have a relationship with Father. Roberts added,

> [H]e also is aware of the mom's issues with drugs. And . . . [Daughter] was not removed [from that] the environment by his doing, but by the Department. So that would—for him to be a part of her life, that would be concerning. Because I don't think that he has her best interest at heart.

Rothas similarly testified that she believed it was in Daughter's best interest to remain with and be adopted by her current placement. Rothas was not in favor of placing Daughter with Father's friend or relatives while Father was awaiting release from prison because it was uncertain when Father was going to be released from prison and because his criminal history indicated that "he would probably not be an appropriate caregiver" for Daughter upon his release. Rothas believed that Father's criminal history "could present a very real danger" to Daughter. Rothas further testified that Daughter was thriving in her current placement, that her foster parents had developed and maintained an appropriate parent-child relationship with Daughter, and that Daughter had bonded with them. She believed "that it would be very traumatic for [Daughter] to be removed from people that she has established a bond with and loves and looks at as her parents" and placed with "people that she does not know, has never met, has no relationship with."

### Statutory grounds for termination

The district court found that Father had endangered Daughter. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). Endangerment means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Hum. Servs. v. Boyd*,

17

727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698-99. A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699.

Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting Tex. Fam. Code § 161.001(b)(1)(D)). "The child's environment refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home." *In re E.A.R.*, 583 S.W.3d 898, 908 (Tex. App.—El Paso 2019, pet. denied). "A child is endangered when the environment creates a potential for danger and the parent is aware of the danger but consciously disregards it." *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under section D." *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). "Evidence of a parent's drug use, or evidence that another parent allowed a child to be around a parent or other persons using drugs, can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D)." *In re C.V.- L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied). Moreover, a single act or omission in placing a child in or failing to remove a child from an endangering environment can support termination under

18

subsection (D). *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.).

Subsection (E) focuses on a parent's conduct and "allows for termination of parental rights if clear and convincing evidence supports that the parent 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *In re N.G.,* 577 S.W.3d at 234 (quoting Tex. Fam. Code § 161.001(b)(1)(E)). "Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act." *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied). "Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *Id*. "The conduct to be examined includes what the parents did both before and after the child was born." *Id*. Because "endangering conduct is not limited to actions directed towards the child," *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citing *Boyd*, 727 S.W.2d at 533), "[i]t necessarily follows that the endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage." *Id*. "Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child is relevant to the issue of whether a parent engaged in a course of conduct that endangered the child's well-being." *In re J.T.G.*, 121 S.W.3d 117, 133 (Tex. App.—Fort Worth 2003, no pet.). It is well established that "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well--being of a child." *Boyd*, 727 S.W.2d at 533. However, "incarceration does support an endangerment finding 'if the evidence, including the imprisonment, shows a course of conduct

19

which has the effect of endangering the physical or emotional well-being of the child.'" *In re J.F.-G.*, 627 S.W.3d at 313 (quoting *Boyd*, 727 S.W.2d at 533–34). "A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *Id.*

Here, the record supports a finding that Father allowed Daughter to live with Mother for the first year of her life even though Father knew that Mother used methamphetamines and associated with individuals who used methamphetamines. Although Father claimed that he was unaware that Mother used methamphetamines at the time he was arrested, the district court was entitled to disbelieve this testimony, particularly considering Father's statement to Nabors during the initial investigation that Mother had "always" had a problem with using methamphetamines, "especially with the individuals she surrounds herself with." Father also told Nabors that "[Mother] has begun drinking heavily along with her substance abuse and he has continued to ask [Mother] to leave the area [where she lives] for [Daughter] and her safety." These statements support a finding that Father was aware of Mother's substance abuse at the time of his arrest but continued to allow Daughter to live with Mother. Additionally, Father testified that he was aware that Mother was using "crystal meth" before Daughter was born and that he knew Mother continued to use methamphetamines after Daughter was born, and he agreed with Daughter's attorney ad litem that leaving Daughter in Mother's care endangered Daughter's emotional and physical well-being. Moreover, Father testified that he had "confronted" Mother "a few times" about her drug use and her association with drug users because he did not want drugs around Daughter, which also supports a finding that Father was aware of Mother's drug use but did nothing to remove Daughter from Mother. We conclude that this evidence is legally and factually sufficient to support the district court's

20

finding that Father knowingly placed or knowingly allowed Daughter to remain in conditions or surroundings which endangered Daughter's physical or emotional well-being of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D); *see also In re M.R.J.M.*, 280 S.W.3d 494, 502-05 (Tex. App.—Fort Worth 2009, no pet.).

Regarding subsection (E), although Father's incarceration, standing alone, is not sufficient to support a finding of endangering conduct, the totality of the evidence, including Father's incarceration, shows that Father engaged in a voluntary, deliberate, and conscious course of conduct that had the effect of endangering the physical or emotional well-being of Daughter. Father had an extensive criminal history that spanned over twenty years and three states, including multiple offenses that were committed in Texas beginning in 2016. Two of those offenses, tampering with evidence and evading arrest, were committed in 2018, and another offense for evading arrest was committed in 2020, after Daughter was born. The 2020 evading-arrest offense resulted in Father's arrest at the motel where he, Mother, and Daughter were living at the time, and it also resulted in Daughter being left in the care of Mother, who Father knew to be a methamphetamine user. Father acknowledged that his action in evading the police when he had a child who needed him was "selfish" behavior and that his criminal activity that resulted in his arrest and incarceration was endangering conduct because it "took [him] away from being able to see [Daughter] or care for her or support her." Specifically, Father's convictions for tampering with evidence and evading arrest resulted in an eight-year prison sentence, and during that time he would not be able to care for Daughter unless he were to be released early on parole, which Father acknowledged might not happen. The district court could have reasonably inferred that Father might have received a lesser sentence for those offenses if he had not chosen to be a repeat offender. Additionally, in Father's absence, Daughter suffered

21

actual harm while in Mother's care. Approximately one month after Father's arrest, Daughter was taken to the emergency room by Mother, where Daughter tested positive for methamphetamines and was treated "for an altered state" in which she "was awake and staring into blank space but was not active." Moreover, Father admitted to using cocaine and methamphetamines, and even though he claimed not to have been arrested for those offenses, the district court could have found that this was further evidence that Father had engaged in a pattern of criminal behavior that subjected Daughter to a life of uncertainty, thereby endangering her physical and emotional well-being. Father admitted that he had engaged in criminal activity for the majority of his 26-year-old daughter's life, and the district court could have reasonably inferred from Father's more recent criminal activity that Father would continue that pattern during Daughter's life. We conclude that this evidence is legally and factually sufficient to support the district court's finding that Father engaged in conduct or knowingly placed Daughter with persons who engaged in conduct which endangered Daughter's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E); *see also J.F.-G.*, 627 S.W.3d at 315; *J.O.A.*, 283 S.W.3d at 345–46; *C.B.*, 458 S.W.3d at 591–92; *M.R.J.M.*, 280 S.W.3d at 503–05; *In re R.W.*, 129 S.W.3d 732, 743 (Tex. App.—Fort Worth 2004, pet. denied).

We overrule Father's second issue.

### Best interest

We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available

to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d at 807; *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

Father's plan for Daughter was for her to be raised by Uncle 1 and Aunt until his release from prison, either in 2028 or earlier if he were to be released on parole. However, by his own admission, Father did "not really" have a relationship with Daughter at the time of trial, and he acknowledged that Daughter might consider him to be a stranger. He had last seen her on the day of his arrest, when she was approximately one year old. Moreover, Uncle 1 and Aunt had never met Daughter and thus were also strangers to her.

In contrast, the Department's plan for Daughter was adoption by her foster parents, with whom she had been placed since the case began in October 2020. By the time of trial, Daughter had been in her current placement for over 18 months and more than half of her life. Father acknowledged that Daughter's foster family was the only family she knew or remembered. Department caseworker Roberts testified that Daughter had "been there so long,

23

that that is her family. So it would be very detrimental to her well-being to disrupt her from what she pretty much only knows."

Roberts testified that Daughter was "absolutely" bonded to her foster parents, and Foster Mother also testified that Daughter was "very much" bonded with her and everyone else in their household. According to Foster Mother, Daughter referred to her and her husband as "Mommy and Daddy," and Foster Mother described Daughter as "adorable," "happy and funny and smart," and "a joy, an absolute joy, to be around every second." Foster Mother wanted to adopt Daughter; was willing to allow Daughter to have contact with her biological relatives; and was "absolutely" committed to continuing to provide Daughter with a safe, stable, and loving home for as long as she needs one. Foster Mother further testified that she understood the importance of cultural ties and had been trained as a foster parent in cultural competency. Foster Mother explained that one of their adopted children was African-American and that they had experience raising him with awareness of and confidence in his culture.

Roberts did not believe that Father and Daughter would ever be able to have an appropriate parent-child relationship, "[w]ithout much rehabilitation" on Father's part. Roberts explained that "based on his criminal history," there was "definitely a concern" that Daughter could be at risk of harm if she continued to have a relationship with Father. Roberts was also concerned that Father was "aware of the mom's issues with drugs" but did not remove Daughter from Mother's care.

"[I]t is well settled that stability and permanence are paramount considerations in evaluating the needs of a child." *S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 255 (Tex. App.—Austin 2022, pet. filed). The district court could have reasonably inferred from the above evidence that the Department's plans for Daughter would provide her with

24

stability and permanence while Father's plans for Daughter would not. The district court also could have found that Daughter did not have a relationship with Father or his relatives, which would make it difficult for them to provide for Daughter's emotional and physical needs, and that Father's criminal history and willingness to allow Daughter to live with Mother, who Father knew to be a methamphetamine user, had presented an emotional or physical danger to Daughter that could be repeated if Father's rights to Daughter were not terminated. We conclude that this evidence is legally and factually sufficient to support the district court's finding that termination of Father's parental rights was in the best interest of Daughter. *See J.W.*, 645 S.W.3d at 747–48; *S.B.*, 654 S.W.3d at 255–56; *E.A.R.*, 583 S.W.3d at 913–14; *In re C.A.J.*, 122 S.W.3d 888, 893-94 (Tex. App.—Fort Worth 2003, no pet.).

We overrule Father's third issue.

## CONCLUSION

We affirm the district court's termination decree.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed: December 28, 2022

25